# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MOTTA & MOTTA LLC, et al., ) | |
| ) | |
| Plaintiff, ) | Case No. 18-cv-5811 |
| ) | |
| v. ) | Judge Robert M. Dow, Jr. |
| ) | |
| LAWYERS 777, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Motta & Motta LLC and Alison and Robert Motta (collectively, "Plaintiffs") bring suit against Defendants Lawyers 777, Patrick Weiland, and Dominick Dolci (collectively, "Defendants") under various state and federal theories. Before the Court is Defendants' motion to dismiss [45] Plaintiffs' amended complaint [42]. For the reasons set forth below, Defendant's motion to dismiss [45] is granted in part and denied in part. Plaintiffs are given until April 17, 2020 to respond to the rule to show cause explained below; failure to do so may result in dismissal with prejudice of some of their state law claims. The case is set for further status on April 28, 2020 at 9;00 a.m. Counsel are directed to file a joint status report, including a discovery plan, no later than April 24, 2020.

### I.  Background[1]

Plaintiffs Alison Motta and Robert Motta are the owners of the law firm Plaintiff Motta & Motta. [42, ¶ 4.] Defendants Dominick Dolci ("Dolci") and Patrick Weiland ("Weiland") are the

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

named partners of the law firm Dolci & Weiland, which is in turn operated by Defendant Lawyers 777. [*Id.*, ¶ 5.] Dolci is the owner of Lawyers 777. [*Id.*]

The two firms' paths crossed when one of Plaintiffs' employees retained Dolci to advise on employment negotiations in 2015. [*Id.*, ¶ 13.] In connection with these negotiations, Dolci had access to information regarding Plaintiffs' business records. [*Id.*, ¶ 14.] He apparently liked what he saw, because he allegedly hatched a convoluted and multi-pronged plot to undermine Plaintiffs' business and redirect existing and future clients to his own firm. [*Id.*]

In March 2016, Plaintiffs allege, Defendants recruited "one or more of" Plaintiffs' employees to screen intake calls. [*Id.*, ¶ 36.] This insider, rather than directing the call within Motta & Motta redirected some clients to Defendants. [*Id.*, ¶¶ 36–37.] Around this time, Weiland and Dolci began to research Plaintiffs' web traffic (as compared to their own). [*Id.*, ¶ 39.] It's not entirely clear how, but as part of this Defendants got access to Plaintiffs' internal data for purposes of this comparison. [*Id.*, ¶¶ 39–40.] On April 4, 2016, Dolci announced his intentions to his firm's staff. [*Id.*, ¶ 41.] On April 12, 2016, somebody, presumably Dolci or Weiland, compared the web traffic to Plaintiffs' and Defendants' respective websites. [*Id.*, ¶ 42.]

In May 2016, Defendants went after Plaintiffs' carefully curated web presence. According to Plaintiffs, they had an extremely popular website that would frequently pop up as one of the first results for Google searches related to attorneys in the Chicagoland area. See [*id.*, ¶¶ 20–23.] Plaintiffs attribute this success to national media coverage, painstaking web-content development, and a "deliberate and aggressive organic SEO strategy." [*Id.*, ¶¶ 28–30.] Plaintiffs averaged almost 5,000 monthly visitors to its site, whereas Defendants' site was much less popular, with no more than 84 visitors over a two-month span. [*Id.*, ¶ 56.]

Defendants started by creating a separate website that included verbatim copies of Plaintiffs' web content. [*Id.*, ¶ 43–44.] Defendants then got one of Plaintiffs' employees to place "canonical tags" onto Plaintiffs' website on May 11, 2016. [*Id.*, ¶¶ 43, 47–49.] Plaintiffs include a lot of background about canonical tags, but for present purposes it suffices to say that these pieces of code tell search engines which of several similar, related website to promote in its search results. See [*id.*, ¶¶ 24–27, 49–51]. For example, a clothing retailer may want people who search for "cocktail dresses" to be directed to their splash page for cocktail dresses, as opposed to one random dress in their collection. The retailer can place canonical tags on the subordinate webpages, telling search engines to instead direct searchers to the splash page. See [*id.*, ¶ 27.] Plaintiffs allege that Defendants placed canonical tags on Plaintiffs' website, effectively telling search engines that Defendants' mirrored duplicate site was not only related to Plaintiffs' site, but also the most important one that should be displayed in search results. [*Id.*, ¶ 48–50.] Immediately following this switch, Plaintiffs' web traffic dropped precipitously to about 1,200 monthly visitors, and Defendants' traffic spiked to over 5,000 a month (which was almost exactly Plaintiffs' traffic before the tags were placed). [*Id.*, ¶ 57.] Clients also began calling Defendants' firm instead of Plaintiffs'. [*Id.*, ¶ 59].[2] Plaintiffs describe this sudden shift in May 2016 as "unmistakable and shocking." [*Id.*] Defendants' scheme worked so well that even searches for "Motta" or specific Motta & Motta attorneys only yielded results for Defendants' firm. [*Id.*, ¶¶ 122–23.] To top it all off, someone contacted all of Plaintiffs' existing clients in September 2016 and told them that Plaintiffs' phone number and address had changed—to Defendants'. [*Id.*, ¶ 54.]

---

[2] According to Plaintiffs, Defendants' wholesale copy-and-paste of their web content initially undercut the scheme, as the copied text directed potential clients to call Plaintiffs' firm. Defendant quickly updated this text, however, to include Defendants' phone number. [*Id.*, ¶ 52.]

3

Plaintiffs, recognizing this drop, published themselves in more professional directories and hired a marketing firm to provide SEO counseling. [*Id.*, ¶ 60.] By September of 2016, Plaintiffs confronted Defendants and told them that "the evidence" suggested that they were cyber-spying. [*Id.*, ¶ 62.] Plaintiffs did not file suit, however, until August 2018. See generally [1]. Plaintiffs admitted that their initial complaint did not abide by Rule 8, [31 at 2], and were given leave to file an amended complaint. See generally [37]. Plaintiff submitted an amended complaint, [42], which alleges a bevy of state law torts along with three federal causes of action: copyright infringement (Count II) [42, ¶¶ 98–109]; violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") (Count VII) [42, ¶¶ 139–49]; and violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("ECPA") and Stored Communications Act, 18 U.S.C. § 2701, *et seq.* ("SCA") (Count VIII) [42, ¶¶ 150–54]. Defendants moved to dismiss [45] the entire amended complaint. Plaintiffs responded [51] substantively—but in the same document also moved for default judgment [51], which the Court denied as "patently frivolous." [56 at 2.] The Court further admonished Plaintiffs "to get their act together, as further violations of the rules, missed court appearances, late filings, or frivolous arguments may result in formal sanctions, up to and including dismissal of this case." [*Id.*] After all that, Defendants timely replied. [57.] Before the Court is Defendants' motion to dismiss for failure to state a claim [45].

## II. Legal Standard

"In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" See, *e.g.*, *Lodholtz v. York Risk Serv. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's complaint needs not include "detailed factual allegations," but it must contain more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, the

4

complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)).

### III. Analysis

Plaintiffs bring several federal and state causes of action. Because federal jurisdiction hinges upon the former, the Court first addresses the copyright, computer fraud, and e-privacy claims, which arise under federal statute. Upon finding that at least one federal claim survives, it moves on to the various state claims.

Preliminarily, however, the Court must address one of Plaintiffs' arguments that permeates their response to the motion to dismiss. Plaintiffs lead by arguing that, pursuant to Rule 12(g)(2), Defendants cannot file a successive motion to dismiss under Rule 12(b)(6) that raises issues not raised in the initial motion. See Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.") This argument is not well-taken for several reasons. First and foremost, Plaintiffs misstate the standard that the Court must apply for allowing successive Rule 12(b)(6) motions to dismiss. Their argument draws from the Ninth Circuit's discussion of Rule 12(g)(2). See [51 at 2-3 (quoting from *In re iPhone Antitrust Litigation*, 846 F.3d 313, 318 (9th Cir. 2017)]. The problem for Plaintiffs is that the paragraph they quote from begins by noting a circuit split and explaining that the Seventh Circuit follows a different path: "The Seventh Circuit has held that Rule 12(g)(2) does not

foreclose a motion to dismiss under Rule 12(b)(6) when there has been a previous motion to dismiss under Rule 12." *Id.* (citing *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(g)(2) does not prohibit a new Rule 12(b)(6) argument from being raised in a successive motion.")) In other words, Plaintiff failed to disclose the correct legal standard in this circuit, despite the fact that it was undoubtedly right in front of them. *Contra cf.* ABA Model Rule 3.3(a)(2) ("A lawyer shall not knowingly[] fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.") Second, even if the Seventh Circuit had adopted the Ninth Circuit's approach, the Ninth Circuit recognized that strict adherence to Rule 12(g)(2) "can produce unnecessary and costly delays, contrary to the direction of Rule 1." *In re iPhone*, 846 F.3d at 318. Thus, even in those circuits that disagree with the Seventh Circuit, courts regularly and properly use their discretion to allow successive 12(b)(6) motions that were not interposed for the sole purpose of delay. *Id.* at 318–20 (collecting cases). Here, there is no indication that Defendants sought to delay these proceedings by including additional arguments in the motion that they would have filed anyway. Finally, many of Defendant's new arguments come in response to new allegations and causes of action in the amended complaint. Thus, many of Plaintiffs arguments were not "available to the party" and therefore Rule 12(g)(2) does not even apply. Fed. R. Civ. P. 12(g)(2). Plaintiffs' argument here is especially off the mark because they were granted leave to amend in part because it was not "readily apparent what claims have actually been asserted and addressed." [37 at 3.]. In short, this argument was a waste of everyone's time and energy, and most assuredly not what the Court had in mind when it cautioned Plaintiffs "to get their act together." [56, at 2.]

A. Federal Claims

1. Copyright Infringement

"To establish copyright infringement, a plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017) (quoting *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007)). Defendants argue that Plaintiffs' complaint, which includes more than a hundred pages of jumbled computer printouts as exhibits, fails the notice pleading standard set out in Rule 8. [45 at 9 (citing *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992) for the proposition that complainants must identify "which specific original works are the subject of the copyright claim")].[3] Moreover, according to Defendants, the complaint fails to plausibly allege damages. As the Court understands Plaintiffs' counterargument, they say that they did, in fact, specify which websites were at issue. Exhibit A, then, was presumably included for illustrative purposes. See *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Plaintiffs also argue that they plausibly alleged causation given that both firms' web traffic effectively flipped following the alleged infringement.

Notwithstanding its presentation, Plaintiffs have the better argument. Although Exhibit A is a difficult read to say the least, the Court need not go down that path yet, because Plaintiffs' complaint does specifically identify which websites they allege have been copied. See [42, ¶ 33 & n.2 (listing three of Plaintiffs' websites and two of Defendants' websites)]. Similarly, Plaintiffs'

---

[3] Defendants also contend that Plaintiffs' copyright claim is doomed because it falls outside the statute of limitations for CFAA. [45 at 2 (arguing that the timing of this lawsuit "is fatal to all federal claims * * * in that the statute of limitations for this alleged act of Computer Fraud had expired prior to filing either the Original or Amended complaints").] Defendants do not connect the dots, however, as to how this claim has anything to do with CFAA. In any event, "[t]he Copyright Act provides that '[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014) (quoting 17 U.S.C. § 507(b)).

Exhibit B includes an attachment that highlights the language in each website that they believe has been copied. This is more than enough to provide notice of the nature of the claims, even under Defendant's preferred test. See *Kelly*, 145 F.R.D. at 36; see also *Twombly*, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the [] claim is and the grounds upon which it rests.") (quotation marks and citations omitted)).[4]

Defendants' causation argument also misses the mark. Defendants argue that Plaintiffs "must show a causal nexus between the infringement and the gross revenues." [45 at 10 (citing *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016) (affirming summary judgment when plaintiff "never produced any evidence supporting his assertion that he has sold the photo for $200")).] But Plaintiffs need not "produce any evidence" in response to a motion to dismiss. Instead, the Court must simply determine if, taking all of their well-pled allegations as true, there is a plausible causal nexus. Plaintiffs have met that low bar here by suggesting that the laborious process of developing web content is directly related to their income insofar as good content draws in clients—and that Defendants began siphoning clients away as soon as they copied Plaintiffs' content. [42, ¶¶ 21, 29, 46, 53, 61 66, 67, 148]; see also [*id.*, ¶ 60 (suggesting that traffic began slowing even before the canonical tags were placed)]. Far more thinly pled and fanciful damages theories have been found to be sufficiently plausible to survive a motion to dismiss. *E.g.*, *Bell v. Chicago Cubs Baseball Club, LLC*, 2020 WL 550605, at *5 (N.D. Ill. Feb. 4, 2020) (denying motion to dismiss, although plaintiff "may find it difficult to marshal any actual evidence that [the allegedly infringing retweet] resulted in a direct financial gain to the [defendant] or actually drew customers to the

---

[4] Defendants further argue that Exhibit B does not have any indication that it was actually sent. See [57 at 3]. That does not matter for the purposes of Rule 8's notice requirement. According to Defendants' own test, all Plaintiff must do is specify what they allege was protected and illicitly copied—Exhibit B, whether or not it was ever sent, gives notice now. *Kelly*, 145 F.R.D. at 36; see also *Twombly*, 550 U.S. at 555.

8

[defendant]."); see also *Porter v. Combs*, 105 F. Supp. 3d 872, 879 (N.D. Ill. 2015) (denying motion to dismiss premised on similar argument because the plaintiff "does not need to allege the specific amount of damages at this stage.")

### 2. CFAA, ECPA, and SCA

Defendant moves to dismiss these counts on the grounds that they are all time-barred as the limitations period began more than two years before August 24, 2018, when the first complaint was filed [1]. Plaintiffs counter that it had not even realized that the violations had occurred until August 2018, starting the clock then. In the alternative, they argue that the claims are not indisputably time barred, because it is unclear when the limitations period began.

"[T]he basic rule [is] that the statute of limitations is an affirmative defense, see Fed. R. Civ. P. 8(c), and need not be addressed in the complaint." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Com'n*, 377 F.3d 682, 688 (7th Cir. 2004). But, "if [a plaintiff] pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court." *Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993). Thus, "a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005).

All of the statutes at issue create civil causes of action for various forms of computer snooping, the details of which are not especially relevant at this point, because the parties seem to agree that the latest the limitations period would have begun would have been with the May 11, 2016 placement of canonical tags. See [45 at 14]; see also [42, ¶ 48 (describing the May 11, 2016 placement of the canonical tags as the "final step in [Defendants'] scheme")].[5] Although all three

---

[5] Although Plaintiffs argue that the placement of the tags was just one of many actions taken in furtherance of the plot, they cannot point to a single allegation in the complaint that postdates the placement of the tags and would delay the limitations period. [51 at 6.] Indeed, the complaint refers to the placement of the tags as the "final step" of the alleged plot. [42, ¶ 48.]

9

statutes impose two-year limitations periods, they define the triggering event that starts the two-year clock differently. As such, they are addressed in turn.

### a. ECPA and SCA

Both the ECPA and SCA require plaintiffs to bring suit within two years of when they "first" "had a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e) ("A civil action under this section may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation."); 18 U.S.C. § 2707(f) ("A civil action under this section may not be commenced later than two years after the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation.") Defendants argue that Plaintiffs first had a reasonable opportunity to discover the alleged canonical tags on May 11, 2016, when it registered an "unmistakable and shocking decrease in online visitor traffic and telephone calls." [45 at 14, quoting [42, ¶ 59].] Plaintiffs counter that they did not become aware of the canonical tags themselves until August 2018, so the clock did not begin ticking until then, or, at the very least, the complaint is ambiguous as to when the action accrued.

The Second Circuit's decision in *Sewell v. Bernardin*, 795 F.3d 337 (2d Cir. 2015), is instructive, as it concerned when the statute of limitations window begins in SCA[6] cases. The court explained that "the limitations period begins to run when the plaintiff discovers that, or has information that would motivate a reasonable person to investigate whether, someone * * * obtained unauthorized access to a stored electronic communication." *Sewell*, 795 F.3d at 340 (quoting 18 U.S.C. § 2701(a)). *Sewell* held that the limitations period began when an AOL user found out that her password had inexplicably changed, because at that moment a reasonable person would have investigated whether her AOL account had been compromised—and that she did not

---

[6] Both parties treat the ECPA and SCA as identical, [42, ¶ 150]; [45 at 14], and the Court sees no reason to do otherwise.

10

learn the exact mechanism of the computer attack until later was of no moment. *Id.* at 340–41. The court reserved judgment, however, about the hypothetical question of whether "the mere inability to access an account without knowledge that one's password had been 'altered' would provide a plaintiff with a reasonable opportunity to discover an SCA violation." *Id.* at 341 n.4. Other courts have explained that the clock begins running when the plaintiff realizes "that something was afoot." *Steinbach v. Village of Forest Park*, 2009 WL 2857302, at *1 (N.D. Ill. Aug. 5, 2009); see also *Brewer v. Hashim*, 2017 WL 2787622, at *12 (D. Vt. June 27, 2017) (dismissing complaint when plaintiff failed to investigate alleged computer fraud within two years of receiving press release that should have motivated him to investigate his online presence); *NXIVM Corp. v. Foley*, 2015 WL 12748008, *7 (N.D.N.Y. Sept. 17, 2015) (granting motion to dismiss when complaint alleged that the plaintiff became suspicious of unauthorized activity more than two years before suit was filed).

Here, Plaintiffs' claim is untimely because a reasonable person would have been motivated to investigate whether someone accessed Plaintiffs' files and system in May 2016, when the number of web referrals and phone calls dropped precipitously. It goes without saying that a reasonable person would investigate the kind of "unmistakable and shocking" developments that Plaintiffs themselves say happened here. Indeed, Plaintiffs concede that they *did* initiate such an investigation in response to the unmistakable and shocking decrease in web traffic. In particular, in the months following this drop, Plaintiffs retained an SEO expert [42, ¶ 61] and in September of that year accused Defendant of obtaining unauthorized access to its stored electronic communication [*id.*, ¶ 62.] Thus, not only would a reasonable person suspect "that something was afoot," *Steinbach*, 2009 WL 2857302, at *1, upon receiving the "shocking" news in May, Plaintiffs in fact *did* suspect and investigate immediately, belying the contention that Plaintiffs had no clue
11

about the alleged spying until August 2018. And that Plaintiffs could not identify the culprit (Defendants) and mechanism (cyber espionage) until September of 2016 is of no assistance, because Plaintiffs had the *opportunity* to discover the violation in May. *Sewell*, 795 F.3d at 341.

### b. CFAA

In contrast, the limitations clause of CFAA provides: "No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). "Damage" means "any impairment to the integrity or availability of data, a program, a system, or information." § 1030(e)(8). That is, the clock begins running not when the plaintiff discovers some aspect of their business is amiss, but rather when they discover the impairment to their system or unavailability of data. Here, there is no indication in the complaint of exactly when Plaintiffs discovered the "impairment to the integrity" of its website, *i.e.*, the "damage." Rather, Plaintiffs explain that it hired an SEO expert in the months following the breach, and ultimately confronted Defendant in late September 2016 (*i.e.* less than two years before filing suit). Thus, this Count is not indisputably time barred, as Plaintiffs may have discovered the damage after August 24, 2016.

## B. State claims[7]

Defendant has challenged the sufficiency of the complaint for each of the state law claims: unfair competition (Count III) [42, ¶¶ 110–20]; tortious interference with a prospective economic advantage (Count IV) [*id*, ¶¶ 121–27]; conversion (Count V) [*id.*, ¶¶ 128–31]; trespass to chattel (Count VI) [*id.*, ¶¶ 132–38]; unjust enrichment (Count IX) [*id.*, ¶¶ 155–60]; injunctive relief (Count X) [*id.*, ¶¶ 161–69]; and accounting (Count XI) [*id.*, ¶¶ 170–72]. Defendant also moved to

---

[7] Because two of the federal claims survive, the Court retains jurisdiction over the state law claims that arise under the same nucleus of operative fact. See 28 U.S.C. § 1367(a); *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164–165 (1997) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

dismiss Count I, civil conspiracy [*id.*, ¶¶ 72–97], on the grounds that such a claim is not an independent cause of action; it was improperly pled; and is inapplicable because this was an intra-corporate conspiracy. Plaintiffs' response to the motion to dismiss only discussed the conspiracy claim, and barely mentioned some (but not all) of the other state law claims in an introductory sentence to its factual recitation. [51 at 3-4 ("This action is premised upon various copyright infringements, unfair competition, Tortious Interference With Prospective Economic Advantage, Conversion, violations of the Communications Privacy Act/Stored Communications Act and the Computer Fraud And Abuse Act (CFAA) and/or conspiracy to violate the CFAA, and civil conspiracy related to an ongoing pattern of unlawful, improper and malicious conduct designed, in part, to unfairly compete and improperly divert existing and potential clients and business from MOTTA to DOLCI and in prt [*sic*] for personal, business or ego-driven gain.")]

"Illinois civil conspiracy law simply 'extend[s] liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act.'" *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 887 (N.D. Ill. 2019) (quoting *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999)). Under Illinois law, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure*, 188 Ill.2d at 133 (quotation marks and citation omitted). "A plaintiff must allege facts establishing both (1) an agreement to accomplish such a goal and (2) a tortious act committed in furtherance of that agreement." *Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 939 (7th Cir. 2012) (citing *McClure*, 188 Ill.2d at 133). "Where * * * a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also

fails." *Horist v. Sudler and Company*, 941 F.3d 274, 281 (7th Cir. 2019) (quoting *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. 2000)).

Thus, Plaintiffs' state-law conspiracy claim hinges upon whether "an independent cause of action" survives the motion to dismiss. As of right now, none does. "[E]ven a complaint that passes muster under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) can be subject to dismissal if a plaintiff does not provide argument in support of the legal adequacy of the complaint." *Lee v. Northeast Illinois Regional Commuter Railroad Corporation*, 912 F.3d 1049, 1053–54 (7th Cir. 2019) (affirming dismissal when the plaintiff's response to the motion to dismiss "merely discussed in lay terms the importance of the dispute and failed to grapple with case law discussing what legally constitutes a 'major' or 'minor' dispute"). Here, Plaintiffs do not respond at all to any of Defendant's arguments for dismissal of the independent state law torts. There is a wrinkle, however, in that Plaintiffs previously defended two of these claims against Defendant's motion to dismiss [21] Plaintiffs' first complaint. See [31 at 14–15]. Regardless, Plaintiffs did not do so as it concerns the *amended* complaint (which, at twice the length, undoubtedly contains different allegations). Instead, Plaintiffs spent their time and space litigating non-starter issues such as default judgment and waiver of the motion to dismiss.

As noted above, this is not the first time that Plaintiffs have fallen short of their duties as responsible litigants. See generally [56.] However, in light of the fact that Plaintiffs submitted this inadequate response to the motion to dismiss before the Court admonished them to do better, the Court proceeds as follows. First, the state law torts that Plaintiffs have utterly failed to defend—conversion; trespass to chattel; unjust enrichment; injunctive relief; and accounting—are dismissed with prejudice. Plaintiffs, who are themselves attorneys, have now had multiple opportunities to state these claims, and have not defended them at all. Second, the Court orders

14

Plaintiff to show cause in writing by April 17, 2020 why the Court should not also dismiss the remaining state law claims (unfair competition, tortious interference with a prospective economic advantage, and, by extension, civil conspiracy) with prejudice in light of Plaintiffs' apparent abdication of these claims by not defending them in opposition to Defendants' motion to dismiss.

IV.     **Conclusion**

For the reasons set forth above, Defendant's motion to dismiss [45] is granted in part and denied in part. Plaintiffs are given until April 20, 2020 to respond to the rule to show cause; failure to do so may result in dismissal with prejudice of some of their state law claims. The case is set for further status on April 28, 2020 at 9;00 a.m. Counsel are directed to file a joint status report, including a discovery plan, no later than April 24, 2020.

Dated:  March 23, 2020

_____
Robert M. Dow, Jr.
United States District Judge