IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTTA & MOTTA LLC, et al., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-5811 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| LAWYERS 777, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' responses to the Court's rule to show cause order [62]; [63]; [64], and Plaintiff's motion for reconsideration [70-1]. Defendants are given leave to reply to Plaintiffs' response to the show cause order no later than August 28, 2020. Plaintiffs' motion for reconsideration [70-1] is denied.

**I.    Background**

The full procedural and factual background of this case are set out in greater detail in the Court's previous orders, [37]; [56]; [59], knowledge of which is assumed.

Plaintiffs Alison Motta and Robert Motta are the owners of the law firm Plaintiff Motta & Motta. Defendants Dominick Dolci ("Dolci") and Patrick Weiland ("Weiland") are the named partners of the law firm Dolci & Weiland, which is in turn operated by Defendant Lawyers 777, which Dolci owns. After Defendants' moved to dismiss [21] Plaintiffs' first complaint [1], Plaintiffs conceded that the complaint did not abide by the rules of Federal Civil Procedure. See [37 at 3]. Construing Plaintiffs' response as a motion for leave to amend, the Court granted Plaintiffs leave to amend their complaint, which Plaintiffs did. [*Id.*]

Briefly, Plaintiffs' First Amended Complaint ("FAC") [42] alleges that Defendants recruited one of Plaintiffs' employees to redirect client inquiries to Defendants. According to

Plaintiffs, Defendants also convinced one of Plaintiffs' employees to embed hidden code onto Plaintiffs' website that redirected search engines to Defendants' website (the "canonical tags"). Plaintiffs allege that this code went live on May 11, 2016 and that there was a contemporaneous "unmistakable and shocking" drop in web traffic. Plaintiffs also invested in more advertising and hired an SEO consultant around this time. Someone contacted all of Plaintiffs' existing clients in September 2016 and told them that Plaintiffs' phone number and address had changed to Defendants'. Around this time, Plaintiffs confronted Defendants about the alleged hacking.

Defendants moved to dismiss [45] the FAC. Plaintiffs' response [51] was defective in several respects. As is most relevant here, Plaintiffs utterly failed to defend several of their causes of action. Instead, they argued that they were entitled to default judgment because Defendants had not timely filed their motion to dismiss (or at least the motion to dismiss should be stricken) and that Defendants had waived certain of their arguments by failing to make them in the initial motion to dismiss. The Court denied the motion for default judgment as "patently frivolous." [56 at 2.] The Court later considered Defendants' motion to dismiss, which it granted in part and denied in part. See generally [59]; *Motta & Motta LLC v. Lawyers 777, LLC*, 2020 WL 1433816 (N.D. Ill. Mar. 24, 2020).[1] The Court allowed two federal claims (one copyright and one computer-snooping) to go forward. *Id.* at *3, 5. Two other computer snooping counts were dismissed as time-barred. *Id.* at *4–5. The Court dismissed with prejudice several claims that Plaintiffs utterly failed

---

[1] The Court has reviewed Plaintiffs' response brief and concluded that *Motta & Motta* correctly described the placement and application of Plaintiffs' Rule 12(g)(2) waiver argument. Compare 2020 WL 1433816, at *3 (describing waiver as the argument that Plaintiffs "lead" with that "permeates their response"), with [51 at 2–3 (first sentence of section entitled "Plaintiffs' Response to Defendants' Motion to Dismiss: Introduction" discusses waiver and cites to *In re Apple iPhone Antitrust Litigation*, 846 F.3d 313, 318 (9th Cir. 2017)), 6 ("Defendants' proximate cause argument is waived as it was not raised in Defendant's first motion to dismiss"), 8 ("'Collective Responsibility' and 'independent tort' arguments waived"); 12 ("Defendants waived this failure too [*sic*] state a copyright claim as it was not previously raised")]; but see [70-1 at 2–4 (arguing that the Court conflated two separate arguments)].

to defend. *Id.* at *6–7. There were others, however, that Plaintiffs had previously defended—in light of the Seventh Circuit's preference that cases be heard on the merits, the Court ordered Plaintiffs to show cause as to why these claims should not be dismissed as well. *Id.*

Plaintiffs responded to the rule to show cause order with a flurry of filings, [62]; [63]; [64], and moved the Court to reconsider [70-1] (a) the dismissal of the time-barred computer-snooping counts and (b) the dismissal with prejudice of the forfeited causes of action. Although the Court explained that it would rule on the motion for reconsideration before considering a motion for leave to amend the complaint, [66], much of the motion for reconsideration reads as a motion for leave to amend. The Court addresses these issues in reverse order, first considering Plaintiffs' respective arguments for reconsideration and then revisiting the rule to show cause order.

## II.    Motion for Reconsideration

### A.    Legal Standard

Federal Rule of Civil Procedure 54(b) governs Plaintiffs' motion for reconsideration. Under Rule 54(b), "any order or other decision [ ] that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); see also *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987), opinion amended on denial of reh'g, 835 F.2d 710 (7th Cir. 1987) (affirming district court's denial of motion to reconsider under Rule 54(b)).

Revisions under Rule 54(b) are discouraged and should be reserved for circumstances in which the initial decision was "clearly erroneous and would work a manifest injustice." See *Ghashiyah v. Frank*, 2008 WL 680203, at *3 (E.D. Wis. Mar. 10, 2008) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)) (internal quotation marks omitted). In

general, "litigants must fight an uphill battle in order to prevail on a motion for reconsideration." *Id.* (citation and internal quotation marks omitted). Motions to reconsider under Rule 54(b) "are judged by largely the same standards as motions to alter or amend a judgment under Rule 59(e)." *Ghashiyah*, 2008 WL 680203, at *3. The Court may grant a Rule 59(e) motion to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial, points to evidence in the record that clearly establishes a manifest error of law or fact, or if the Court previously misunderstood a party's arguments. *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012); *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008). Rule 59(e) "enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Miller*, 683 F.3d at 813 (citation and internal quotation marks omitted). Rule 59(e) motions are "not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier." *Id.* (citation and internal quotation marks omitted). A party moving for reconsideration bears a heavy burden and its motion must be supported by a showing of extraordinary circumstances. *Mahurkar v. C.R. Bard, Inc.*, 2003 WL 22844237, at *1 (N.D. Ill. Dec. 1, 2003) (citing *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)).

    B.    **Time Barred Claims**

In the FAC, Plaintiffs advanced federal computer snooping claims under three federal statutes: the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA"), and the Electronic Communications Privacy Act/Stored Communications Act ("ECPA/SCA"), respectively 18 U.S.C. § 2510, *et seq.*; 18 U.S.C. § 2701, *et seq.*[2] In the motion to dismiss, Defendants argued that all of these claims were barred under each statute's two-year limitations

---

[2] As before, the Court sees no reason to depart from the parties' treatment of these statutes as identical. See *Motta & Motta*, 2020 WL 1433816, at *5 n.6.

4

period because the relevant conduct (placing the computer tags) occurred in May 2016, but suit was not filed until August 2018. Plaintiffs countered that the limitations period did not even begin until August 2018, because that was the point at which they had gathered evidence of the canonical tags themselves. The Court noted that there are subtle differences between CFAA's limitations provision and that of the ECPA/SCA; it allowed the former claim to proceed but dismissed the latter. *Motta & Motta*, 2020 WL 1433816, at *5. Plaintiffs argue that the Court erred in dismissing any of these claims. In so doing, they rely on the original complaint's allegations as well as a "certification in lieu of affidavit" ("CILA") filed by one of their attorneys. They claim that the Court misunderstood or impermissibly made inferences against them; the continuing violation doctrine should apply; and their supplemental allegations suggest that the suit was not time-barred.

Preliminarily, the Court did not misunderstand Plaintiffs. As explained in *Motta & Motta*, the SCA and ECPA have a two-year limitations window that begins tolling when Plaintiffs "first" "had a reasonable opportunity to discover the violation." 2020 WL 1433816, at *4 (quoting the relevant statutory provisions). In Defendants' original motion to dismiss, they cited case law explaining that a plaintiff has a reasonable opportunity to discover the violation "when the plaintiff discovers that, or has information that would motivate a reasonable person to investigate" whether their systems or information had been compromised. See [45 at 14 (citing *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015))]. Defendants argued that the date on which the statute of limitations began to run was in May 2016, when the Plaintiffs allege that the number of visitors to their website and prospective telephone callers shockingly and unmistakably plummeted. In response, Plaintiffs, without citing any authority relevant to the SCA, opined that the limitations period began in August 2018, when Plaintiffs learned of the exact mechanism (the tags) through which their websites were hacked. Plaintiffs' argument was an obvious nonstarter in light of *Sewell* and their own allegations

5

that they accused Defendants of "cyber-spying" and "commercial espionage" as early as September 22, 2016. [42, ¶ 62.] The Court did not patently misunderstand Plaintiffs' argument the first time around. Rather, Plaintiffs advance several whole new theories in the instant motion.

The Court also did not make impermissible inferences against Plaintiffs. The FAC alleged that there was an "unmistakable and shocking decrease in online visitor traffic and telephone calls to MOTTA" starting in May 2016; "Motta increased monies spent on its online advertising" on May 6, 2016; and "in the months thereafter, MOTTA published in additional directories and hired a marketing firm to provide SEO services." [42, ¶¶ 59–61.] The Court concluded that these allegations foreclosed any possibility that the cause of action was untimely, reasoning that a reasonable person would have investigated the unmistakable and shocking developments that were so timed.³ *Motta & Motta*, 2020 WL 1433816, at *5. Now, Plaintiffs argue that dismissal is inappropriate because the complaint does not squarely admit when they found out about the shocking drop. Putting aside any questions of whether Plaintiffs waived this argument, the Court's decision was not manifestly erroneous. The FAC alleges that Plaintiffs spent a lot of time and resources developing and executing their SEO strategy; this strategy was something that they deliberately focused on; they made a series of moves in the SEO space immediately preceding and following the placement of the tags; and the external manifestation of Defendants' alleged malfeasance was shocking and unmistakable. Based on the allegations in the FAC, this claim is time-barred because a reasonable person would investigate a shocking development relating to

---

³ Though the Court did not gild the lily in its original opinion, there are other allegations in the FAC that further underscore that Plaintiffs had an opportunity to discover the violation early on. Indeed, Plaintiffs describe and reference their deliberate and aggressive SEO strategy repeatedly throughout the complaint. [42, ¶¶ 21, 28–29, 112.]

6

something that they (a) generally find very important, and (b) are actively focused on, such as their business. See *NXIVM Corp. v. Foley*, 2015 WL 12748008, at *7–8 (N.D.N.Y. Sept. 17, 2015).[4]

Next, the continuing violation doctrine is inapplicable here. Again, putting aside any question of waiver, that doctrine is a poor fit for these allegations and statutes. Preliminarily, the portion of the complaint focused on the ECPA/SCA focuses on a single act (the placement of the tags). [42, ¶¶ 151–53.] Likewise, the limitations period in question begins running when Plaintiffs "*first*" "had a reasonable opportunity to discover the violation," not at some nebulous future point. 18 U.S.C. § 2520(e); 18 U.S.C. § 2707(f) (emphasis added); see also *Limestone Development Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 801–802 (7th Cir. 2008) (providing a review of the "misnamed" continuing violation doctrine and explaining that "[t]he statute of limitations begins to run upon injury * * * and is not tolled by subsequent injuries"). Though Defendants allegedly may have done *something* in service of their general fraudulent scheme after May 2016, only a separate violation of the ECPA/SCA would trigger a new limitations period—and that still would not save their current claim.[5] *Limestone Development*, 520 F.3d at 801. Plaintiffs' citation to *Meyer Technology Solutions, LLC v. Kaegem Corp.*, 2017 WL 4512918, at *1 (N.D Ill. Oct. 10, 2017),

---

[4] Because the statutory text discusses a "reasonable opportunity to discover" as opposed to subjective knowledge, pleading around an ECPA/SCA statute of limitations is no simple matter, particularly when plaintiffs also plead that there was an obvious external manifestation of the hacking and that plaintiffs normally focus on the arena of that manifestation. See *NXIVM*, 2015 WL 12748008, at *7–8.

[5] Plaintiffs' insinuations that they may be able to amend their complaint to add another violation of the ECPA/SCA, see [62 at 5]; [70-1 at 14], are not properly before the Court. See *Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (collecting cases about how to properly move to amend a complaint); see also *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (explaining that it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"). To the extent that these allegations were used to elaborate on the operative complaint, they actually contradict the FAC, which provides that the basis of the ECPA/SCA claim was the placement of the canonical tags [42, ¶¶ 151–53], and that the "final step in [this] scheme" was executed "[o]n or before May 11, 2016." [*Id.*, ¶ 48.]

is thus unavailing, because the court rejected the application of the continuing violation doctrine for similar reasons as here.

Finally, Plaintiffs' additional submissions do not change the Court's analysis.[6] The CILA explains that the head of Plaintiffs' marketing department ("Callahan"), who was allegedly in cahoots with Defendants, "was terminated" on June 1, 2016. In mid-September Plaintiffs investigated Callahan and learned that he had gained access to Plaintiffs' personal email accounts and servers; on September 21, 2016, Plaintiffs fired another associate, who then made a cryptic comment about Callahan cyber-spying. Also on September 21, Plaintiffs' AVVO rep let them know that there was suspicious activity on their accounts. The CILA also claims that "from February of 2016 through the end of trial in October of 2016, [Plaintiffs] had no reason to believe or to know that anything was afoot" because they were busy litigating a quadruple homicide death penalty-case in Nebraska. Plaintiffs claim that the reason that they initially paid no mind to the reduced phone calls was because they assumed that the new marketing employee was simply not as adept as Callahan. The CILA further states that Plaintiffs did not discover the drop in web traffic because Callahan hid it during his employ.

The CILA is internally contradictory, contradicts the FAC, and does not erode the inference that Plaintiffs first had a reasonable opportunity to discover the violation before mid-August 2016. The CILA claims that Plaintiffs "had no reason to believe or to know that anything was afoot" until after October 2016, but it also claims that the firm's principals thrice investigated or otherwise

---

[6] This CILA raises an interesting question about the intersection between the motion for reconsideration standard and liberal pleading standards. As explained above, Plaintiffs must clear a high bar to prevail on this motion. The Court must have patently misunderstood Plaintiffs arguments or been clearly wrong on a question of fact or law. On the other hand, the Court may presumably consider other allegations raised here when such allegations are consistent with the FAC and used for illustrative purposes. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The Court assumes without deciding that it may consider this certification in the light most favorable to Plaintiffs—but only to the extent that it is consistent with the FAC and used to illustrate or clarify those allegations.

learned of various cyber-misdeeds in September of that year. (And for people who claim to have been far too busy to notice how their law firm was being managed, they made a lot of personnel changes between February and October 2016.) Likewise, the FAC is quite clear that the drop in web traffic began in May 2016, not in June, when Callahan was terminated. Finally, even if Callahan covered his tracks before his termination, he could not do so for the months of June, July, and August. Indeed, the CILA effectively concedes that Plaintiffs were aware of the shocking, unmistakable, and discontinuous change in web and phone traffic, though they allegedly initially misinterpreted its causes. [63, ¶ 9 ("Prior to [September 21, 2016] any decrease in phone calls was thought to have been that our subsequent marketing employee was not as effective at SEO work * * * as [] Callahan was.")]; compare also [62 at 4 n.3 (conceding that Plaintiffs investigated the discontinuous drop in September 2016)], with [*id.* at 4–5 (arguing that they did not have exact web statistics until August 2018—even though they had hired an SEO consultant in 2016]). As explained in *Motta & Motta*, this drop was contemporaneous with advertising investments and soon followed by the retention of an SEO consultant (*i.e.*, things that should make web traffic spike, not plummet). Even viewing these allegations as rosily as possible, there is simply no way to arrange them in any way that does not necessarily imply that Plaintiffs had "information that would motivate a reasonable person to investigate" whether something was amiss or otherwise had "a reasonable opportunity to discover" the placement of the tags. *Sewell*, 795 F.3d at 340; *NXIVM*, 2015 WL 12748008, at *7–8; *Steinbach v. Village of Forest Park*, 2009 WL 2857302, at *1 (N.D. Ill. Aug. 5, 2009).[7]

---

[7] The CILA also raises all kinds of other contradictions that the Court need not resolve quite yet. For example, why was the old marketing guy terminated in June 2016 if everyone thought that everything was going swimmingly and was too busy to focus on anything else? If they thought that his successor was exponentially worse on a key component of their marketing strategy, why didn't the new employee get terminated too? What were these marketing people doing trying to drum up new business at the exact moment that the firm was too busy to pay *any* attention to these efforts? Finally, why isn't Callahan listed

C.     **Dismissal with Prejudice/Leave to Amend**

As explained above, the Court dismissed some of Plaintiff's causes of action with prejudice because Plaintiffs did not defend them in response to a motion to dismiss. Although the Seventh Circuit expresses a general preference for litigating cases on the merits, it has consistently held that district courts do not abuse their discretion by applying the waiver rule. *E.g.*, *Motta & Motta*, 2020 WL 1433816, at *6 (quoting *Lee v. Northeast Illinois Regional Commuter Railroad Corporation*, 912 F.3d 1049, 1053–54 (7th Cir. 2019)); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (citations and quotation marks omitted); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("An unresponsive response is no response. In effect the plaintiff was defaulted for refusing to respond to the motion to dismiss. And rightly so.") (collecting cases). Plaintiffs effectively concede as much. See [70-1 at 11–12 ("Although the Court has discretion to find that Plaintiffs have abdicated their claims by failing to respond, the Court's the [*sic*] exercise of an inherent power must be a reasonable response to a specific problem and the power cannot contradict any express rule or statute.") (citations and internal quotation marks omitted)]. The Court did not err in assuming that Plaintiffs' decision to ignore some of the claims in their blunderbuss, 36-page complaint reflected forfeiture. In any event, even if the Court *had* abused its

---

as a Defendant given that Plaintiffs have apparently known that he was a bad-actor computer-hacker since September 2016, and he is, according to them, both the brain and the brawn of this alleged operation?

discretion, the application of the waiver rule here was not a manifest error and therefore Plaintiffs' motion for reconsideration is denied.[8]

Although the Court explained that it would defer ruling on whether Plaintiffs may submit an amended complaint, they have briefed that issue here at least as it pertains to the abandoned causes of action. Because Plaintiffs are correct that the amendment standard is sometimes wrapped up in how courts reconsider dismissal, see *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 630 (7th Cir. 2020), the Court will address whether amendment should be allowed pursuant to Rule 15(a). Rule 15(a)(1) allows one amendment to a pleading as a matter of course under certain circumstances. Because Plaintiff have already amended their complaint, they are not entitled to an amendment as a matter of course. See Rule 15(a)(1).

Under Rule 15(a)(2), however, "the court should freely give leave [to amend] when justice so requires." *Id.* Ultimately, this decision is discretionary. *Alioto*, 651 F.3d at 720. The Court may properly deny leave to amend in the face of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *O'Brien v. Village of Lincolnshire*, 955 F.3d at 629 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Preliminarily, most of Plaintiffs' citations are to cases that allow parties to amend a complaint to fix problems identified in an opinion granting a motion to dismiss. Here, however,

---

[8] Plaintiffs also seem to argue that Defendants' motion to dismiss was simply too cursory on the various claims that were dismissed with prejudice. It may be true that, on further inspection, Defendants' citations to and descriptions of Illinois case law were inapt. It may also be true that the complaint actually adequately pleaded each of these dismissed claims. But the point of the waiver rule is that it is Plaintiffs' burden to defend the legal sufficiency of their complaint when faced with a seemingly credible motion to dismiss. *Kirksey*, 168 F.3d at 1041. When they fail to do so, they risk forfeiting those claims. *Id.*; see also *Lee*, 912 F.3d at 1054 (explaining that the waiver rule may, in practice, lead to the dismissal of adequately pled complaints).

the Court has not yet identified problems with the causes of action in question because Plaintiffs utterly failed to defend them. Thus, it is not at all clear what amendment would accomplish to begin with, let alone whether justice requires it.

In any event, based on the arguments before the Court, justice does not require allowing amendment to replead the abandoned claims, because amendment would cause undue delay, further motions practice would unduly prejudice Defendants, and Plaintiffs failures were not excusable. Plaintiffs filed this lawsuit almost exactly two years ago, in August 2018. The FAC is also clear that the events precipitating this lawsuit occurred more than two years before that, giving Plaintiffs, who are themselves attorneys, ample time to investigate and organize their thoughts into a cogent complaint. Now, after responding to two motions to dismiss, they want to start over from square one. Though the Court might be inclined to countenance such delays with *pro se* litigants, Plaintiffs here are represented. In fact, they represent themselves, so the normal justifications for allowing further amendment (*e.g.*, something getting lost in translation between client and counsel; not wanting to hold an agent's errors against a blameless principal; *etc.*) are also inapplicable.

Indeed, Defendants have now had to wade through two convoluted complaints. The current iteration stands at 36 pages, with an additional 100-plus pages of almost entirely illegible attachments. One of the attachments filed here was a 1600 page-long spreadsheet, the import of which is not apparent. [64 at 5–1600.] "Federal civil motion practice is expensive and burdensome." *Kotaska v. Federal Express Corporation*, --- F.3d ---, 2020 WL 4036216, at *12 (7th Cir. July 17, 2020) (Hamilton, J., dissenting), but these costs have heretofore been asymmetric. See generally [49 (cataloguing Plaintiffs' delays and arguing that these have been costly)]. Defendants had to try to decipher Plaintiffs' initial complaint, which Plaintiffs themselves admitted did not abide by the Federal Rules of Civil Procedure. Next, Defendants analyzed each

12

of Plaintiffs' claims in the FAC, while Plaintiffs did not bother to respond to many of Defendants' arguments. Instead, Plaintiffs did not take notes (or failed to save them) during one court hearing, missed another, advanced a patently frivolous argument for terminal relief, and began their alternative response to the motion to dismiss with a block-quote to an out-of-circuit case that they now admit they did not even bother to cursorily skim (and even if successful would have only delayed consideration of Defendants' motion). There is no reason to subject Defendants to at least another round of motions to dismiss due to Plaintiffs' feeble prosecution of their own case.

Plaintiffs counter that justice requires allowing amendment because their mistake was inadvertent. Preliminarily, they do not cite a single case in which a court granted leave to replead after a plaintiff had utterly failed to respond to arguments raised in a motion to dismiss and instead advanced frivolities. See [70-1 at 15 (citing *CMFG Life Ins. Co. v. UBS Securities, LLC*, 2015 WL 4645861, at *2 (W.D. Wis. Aug 5, 2015) (reconsidering termination of case to give plaintiff opportunity to amend complaint to address substantive deficiencies identified in opinion granting motion to dismiss); *Naturalock Solutions, LLC v. Baxter Healthcare Corporation*, 2016 WL 5792377, at *9 (N.D. Ill. Oct. 4, 2016) (granting leave to amend after issuing substantive opinion dismissing several counts))]. But more to the point, it's hard to say that Plaintiffs' omissions were a one-off mistake.[9] Their decision to file a motion for default judgment was the culmination of several serious lapses, including missing a court date. Rather than reaching out to the courtroom deputy, ordering a transcript, or asking opposing counsel for clarification, they simply assumed that Plaintiffs had blown past the deadline for filing a motion to dismiss. Also, if Plaintiffs really thought they had such a strong default argument that no other response was necessary, why did

---

[9] Plaintiffs' failure to substantively respond to several of Defendants' arguments is conceptually distinct from their ill-fated attempts to argue default or waiver. Plaintiffs could very well have argued default and waiver *and* substantively responded to all of Defendants' arguments. That they chose to do the former and not do the latter, though, is telling.

13

they address some (but not all) of the substantive grounds for dismissal? And at the risk of beating a dead horse, did they really think that the Court would strike the motion to dismiss or enter default judgment because Defendants had inadvertently missed a deadline—especially considering that their current litigation position is that such an action would be a manifestly erroneous abuse of discretion? Though the Court will not go so far as to proclaim Plaintiffs "bad faith" litigants, see *O'Brien*, 955 F.3d at 629 (quoting *Foman*, 371 U.S. at 182), it is safe to say that this motion "does not warrant an act of grace." See *Alioto*, 651 F.3d at 722.

Finally, contrary to Plaintiffs' position, Rule 1 counsels against—not for—allowing further amendment at this time or reconsidering the dismissal. The Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." As explained above, allowing further amendment at this point would add needless expense and delay, especially given that this all started because Plaintiffs failed to defend their own allegedly multi-million-dollar claims.

## III.     Response to Rule to Show Cause Order

With all that out of the way, the Court returns to Plaintiffs' response to the show cause order. In *Motta & Motta* the Court noted that although Plaintiffs failed to defend their unfair competition and intentional interference with a prospective economic advantage claims, Plaintiffs had previously done so. Plaintiffs were ordered to "show cause in writing * * * why the Court should not also dismiss [them] with prejudice in light of Plaintiffs' apparent abdication of those claims by not defending them in opposition to Defendants' motion to dismiss." *Motta & Motta*, 2020 WL 1433816, at *7. The Court was reticent to jump to such an extreme remedy as dismissal given that Plaintiffs had previously showed interest in the claim and the Court's cursory review of the FAC showed several allegations that appeared to have been added to buttress these two claims.

14

While the Court is unimpressed with Plaintiffs' multifold response to the show cause order—including the internally-contradictory CILA, spreadsheet attachment, and at-times incomprehensible prose, see [62 at 4 n.2]—that is not reason to dismiss these claims outright. As noted above, the Court is not yet ready to declare Plaintiffs' approach "bad faith," and therefore any sanction under the Court's inherent power would be inappropriate. *Fuery v. City of Chicago*, 900 F.3d 450, 463–64 (7th Cir. 2018) (quoting *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012) ("A district court may impose sanctions under its inherent authority 'where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith.' * * * Mere clumsy lawyering is not enough."). Here, Plaintiffs have attempted to justify their ill-fated response to the motion to dismiss as mere clumsiness and have provided legal arguments against dismissal. Dismissal of a potentially meritorious (and now mostly briefed) claim just because of Plaintiffs' aggravating and careless behavior would be excessive, especially given that several of their other abandoned claims remain dismissed.

Defendants are given leave to reply to Plaintiffs' response to the show cause order, addressing any substantive legal argument they make in defense of their intentional interference or unfair competition claims. Such a reply, if Defendants choose to submit it, is due by August 28, 2020. In the interest of judicial economy and preservation of Defendants' resources, however, it does appear at first blush as if Plaintiffs have stated intentional interference with a prospective economic advantage and unfair competition[10] claims that can survive a Rule 12(b)(6) motion to

---

[10] The less said about "unfair competition" the better. This cause of action is "elusive," *Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110, 1118 (7th Cir. 1990) (applying New York law), and "Illinois courts have not specifically identified [its] elements." *A-1 Packaging Solutions, Inc. v. RFID Resolution Team, Inc.*, 2019 WL 958359, at *4 (C.D. Ill. Feb. 27, 2019). Other courts applying Illinois law treat it as coterminous with intentional interference for the purposes of a motion to dismiss, which the Court shall do as well. See *Id.* at *4–5 (collecting cases); *BlueStar Management v. The Annex Club, LLC*, 2010 WL 2802213, at *9 (N.D. Ill. July 12, 2010) ("Moreover, courts in this district have recognized that the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to

dismiss. See *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d. 849, 862 (1st Dist. 2008) ("The elements of the tort of intentional interference with a business expectancy include (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference."); [42, ¶¶ 36–37 (someone redirects client inquiries intended for Plaintiffs to Defendants); 54 (someone calls Plaintiffs' clients, telling them that Plaintiffs' firm has folded into Defendants'); 122–23 (search results for Plaintiffs' names redirect to Defendants' site).] Of course, if there is some wrinkle the Court is missing, Defendants may point it out in reply.

Assuming arguendo that Plaintiffs' substantive business tort claims survive, then their civil conspiracy theory of liability against Weiland (Count I) would survive as well. "Illinois civil conspiracy law simply 'extend[s] liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act.'" *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 887 (N.D. Ill. 2019) (quoting *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999)); see also *Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 939 (7th Cir. 2012) (citing *McClure,* 188 Ill.2d at 133) (for a defendant to be liable, he "must have 'under[stood] the general objectives of the conspiratorial scheme, accept[ed] them, and agree[d], either explicitly or implicitly to do [his] part to further those objectives.'") Ultimately, determining whether a conspiracy claim should survive a motion to dismiss is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (quoting

---

state a claim for unfair competition.") (citation omitted); see also *Dynamic Fluid Control (PTY) Ltd. v. International Valve Mfg., LLC*, 790 F. Supp. 2d 732, 740 (N.D. Ill. 2011) (allowing unfair competition to proceed where plaintiffs adequately pleaded related statutory violation).

16

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Among the factors that should be considered are the discovery burden and the plausibility and specificity of any allegations of agreement. *Id.* Here, Weiland is already subject to discovery given that he was allegedly in the room for many of the discussions, decisions, and actions giving rise to this litigation. And Plaintiffs have alleged sufficient detail to put Weiland on notice of the nature of the allegations against him and from which the Court can plausibly infer that he planned, assisted, or encouraged Dolci and Callahan's actions. *E.g.* [42, ¶¶ 39, 41, 63, 77–78, 80–81.][11]

### IV. Conclusion

For the reasons set forth above, Plaintiffs' motion for reconsideration [70-1] is denied. Defendants are given leave to reply to Plaintiffs' response to the show cause order no later than August 28, 2020.

Dated: August 7, 2020

Robert M. Dow, Jr.
United States District Judge

---

[11] Likewise, at least at this stage, Weiland's liability is not precluded by the intracorporate conspiracy doctrine. "The intracorporate conspiracy doctrine provides that, because the acts of an agent are considered to be the acts of the principal, an agent acting within the scope of his employment cannot conspire with the principal nor with other agents." *Milliman v. Henry County*, 2012 WL 5200092, at *4 (N.D. Ill. Oct. 22, 2012) (collecting Illinois cases). One exception to the doctrine "'exists when the conspirators act beyond the scope of their official duties.'" *Id.* (quoting *Georgeson v. DuPage Surgical Consultants, Ltd.*, 2005 WL 1799281, at *2 (N.D. Ill. July 26, 2005)). Based on the allegations in the complaint, it is plausible that the alleged conspirators acted outside of their official duties when they suborned the rerouting of calls, placement of malicious code, or direct outreach to Plaintiffs' clients.